Kobin Coal Corporation and  :
Hazleton Shaft Corporation,  :
    Petitioners  :
         :
   v.      :
         :
Department of General Services  :
and Department of Corrections,  : No. 600 C.D. 2018
    Respondents  : Argued: December 11, 2018

BEFORE: HONORABLE ROBERT SIMPSON, Judge
     HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON    FILED: January 7, 2019

    Kobin Coal Corporation (Kobin) and Hazleton Shaft Corporation (Hazleton Shaft) petition this Court for review of the April 2, 2018 order issued by the Board of Claims (Board), which entered a judgment of no award in favor of the Department of General Services (DGS) and the Department of Corrections (DOC). The Board concluded that Kobin and Hazleton Shaft failed to establish a claim for constructive fraud, breach of contract and damages. Upon review, we affirm.

    The pertinent facts as found by the Board are not in dispute. Kobin and Hazleton Shaft are Pennsylvania corporations located in Hazleton, Pennsylvania. Findings of Fact (F.F.) 1 & 3. Kobin is an anthracite coal broker that purchases coal from mining operations and resells the coal to purchasers, including the

Commonwealth. F.F. 2. On April 26, 2012, DGS issued an invitation for bids (RFQ), soliciting bids to supply the anthracite and/or bituminous coal requirements for various Commonwealth facilities for the period of July 1, 2012 to June 30, 2013. F.F. 6. The RFQ for anthracite coal included for each Commonwealth facility a spreadsheet listing, in part, the estimated annual usage for each facility. F.F. 7. DGS also provided, with the bid and contract documents, a spreadsheet breaking down the annual estimated usage for each facility, including State Correctional Institution-Camp Hill (SCI-CH) by month, beginning with July 2012. F.F. 12. On or about May 16, 2012, Kobin submitted its bid to supply the anthracite coal needs for 17 of the Commonwealth facilities, including SCI-CH. F.F. 9. On July 11, 2012, DGS awarded Kobin the contract to be a supplier of the "actual requirements" of anthracite coal for several of the facilities, including SCI-CH, for the initial term of July 1, 2012 through June 30, 2013. F.F. 10 & 14. The contract specified that:

> It shall be understood and agreed that any quantities listed in the [c]ontract are *estimated only* and may be increased or decreased in accordance with the *actual requirements* of *the Commonwealth* and that the Commonwealth in accepting any bid or portion thereof, *contracts only and agrees to purchase only the materials* and services *in such quantities as represent the actual requirements of the Commonwealth*. The Commonwealth reserves the right to purchase materials and services covered under the [c]ontract through a separate competitive procurement procedure, whenever Commonwealth deems it to be in its best interest.

V.11 CONTRACT-007.02 Estimated Quantities (Nov. 30, 2006); Reproduced Record (R.R.) 54 (emphasis added). The estimated quantity of "Barley" coal required by SCI-CH for the contract period was 13,600 tons at the contract price of $183 per ton. F.F. 15. Kobin submitted with its bid a commitment letter from

2

Hazleton Shaft dated May 23, 2012, by which Hazleton Shaft agreed to provide Kobin with up to 20,000 tons of Barley coal as required by the contract. F.F. 18. To assure that it had an adequate source of Barley coal to fulfill its commitment under the 2012-2013 contract, Kobin executed a purchase order on July 25, 2012 with Hazleton Shaft to provide the coal for Kobin's contract with DGS, as available. F.F. 22. The contract provided that the Commonwealth, through DOC, was to issue a purchase order when it required coal for the facility, F.F. 23; R.R. 32, and Kobin had to provide DOC with the required quantity requested in the purchase order within 30 days. F.F. 23. Pursuant to this procedure, Kobin made monthly deliveries to SCI-CH in July, August and September 2012, totaling 1,477 tons, 123 tons short of the estimated usage for these months. F.F. 24.

At all times relevant to the contract, DOC required coal to fuel two Boilers located at SCI-CH, Boiler #2 and Boiler #3, which were installed in approximately 1938, but SCI-CH also had two oil-fueled boilers on the premises. F.F. 25. Boiler #3 had not been operational since March 28, 2012, prior to DGS issuing the RFQ on April 26, 2012. *See* F.F. 26. However, Boiler #2 was operational but in need of repair when DGS solicited bids in April 2012 through mid-July 2012 when DGS awarded Kobin the contract. F.F. 39. As DGS was engaged in the bidding process on the contract, the utility plant supervisor at SCI-CH, Matthew W. Klopotek (Klopotek), commenced obtaining estimates for repairs to Boilers #2 and #3. F.F. 27-29.

On June 20, 2012, Klopotek received estimates for repairs to Boilers #2 and #3 from Trojan Boiler Service (Trojan), dated June 11, 2012, to perform required repairs to Boiler #2 at a cost of $536,000. F.F. 27. Klopotek received from Munroe, Inc. of Pittsburgh separate estimates to: rebuild/refurbish coal Boiler #3 for

$1,400,000 and provide a natural gas boiler to replace one or both coal Boilers for $950,000. F.F. 28. On July 23 and 24, 2012, Klopotek received estimates from two other companies to replace a coal boiler, and an estimate to provide to SCI-CH a rental boiler capable of burning fuel oil or natural gas. F.F. 29-30. Because the estimates exceeded $300,000, DGS and DOC would need to obtain a capital appropriation by the General Assembly to complete the repairs to the Boilers. F.F. 63.[1]

On July 31, 2012, Boiler #2 was shut down due to problems with a conveyance system that had been installed in 2008. F.F. 31 & 40. Through the summer of 2012, the condition of Boiler #2 continued to be investigated. F.F. 41. Between September 26-28, 2012, Trojan conducted an inspection of Boiler #2 to determine the full nature of the problems, what repairs were needed, and whether the Boiler could be operated. F.F. 43. On September 28, 2012 and October 1, 2012, the Chief Engineer for DOC, Norm Klinikowski, P.E. (Klinikowski), and the facility maintenance manager at DOC, Howard Gouse (Gouse), exchanged emails regarding the state of operations of the Boilers. F.F. 44. The email exchanges revealed, in pertinent part, that: (1) Boiler #3 was not operational and would not be available for the 2012 heating season; (2) "[B]and-Aid" repairs were not possible to Boiler #3 due to extensive damage to the Boiler's tubes; (3) Boiler #2 required repairs to the stoker that would take approximately three months and cost approximately $300,000 in parts; (4) although Boiler #2 could be made operational to get through the winter season by replacing some wear parts, all wear parts on the stoker would need to be replaced in the off-season; and (5) with both coal Boilers requiring repair, "coal use

---

[1] If an agency has a project that requires an expenditure in excess of $300,000, then the agency must obtain authorization for the expenditure by action of the General Assembly. 10/4/17 Notes of Testimony (N.T.) at 125.

would drop by 80% to 1,800 tons." F.F. 44. On September 30, 2012, Klinikowski sent an email to the Director of the DGS Bureau of Engineering and Architecture to inform him that the preceding Friday (September 28, 2012), DOC had "just found out about a development with the coal burners that may affect their ability to operate for the next two or three months." F.F. 45.

On October 4, 2012, Trojan submitted to Klopotek of SCI-CH a report on the September 26-28 inspection of Boiler #2, which revealed that it was in "operational condition" but it was experiencing a number of problems that required attention and for which repairs were possible at an estimated cost of $500,000. F.F. 46. With the repairs, Trojan concluded, through its inspector, that Boiler #2 could be run as is, though it was not known for how much longer. F.F. 46. On October 5, 2012, Klinikowski sent an email to personnel at DGS, including commodity specialist George Landis (Landis) and commodity manager for procurement Gregory Knerr (Knerr), notifying them that it is likely that SCI-CH would be using more fuel oil rather than coal because "[r]ight now, Camp Hill cannot burn coal." F.F. 48. Landis replied to Klinikowski's email on October 5, 2012, seeking additional information on the situation with the coal because "[i]f we are not burning coal or a reduced amount then I need to inform the supplier" and "[t]he supplier has dollars at risk if we take no coal so we need to provide them [sic] a reduced estimated [sic]." F.F. 49.

On October 22, 2012, Landis sent a follow up email to Klinikowski and Gouse, with copies sent to Knerr and others, asking if "we have an update on the coal situation at Camp Hill?" F.F. 50. Gouse of DOC replied, stating "please contact Kobin Coal, and let them know we won't be taking any coal through December at a minimum" and "I cannot give you a firm date to resume any coal deliveries at this

time." F.F. 51. Gouse further indicated to Landis that "we had no way to predict that we would be dealing with a problem this long with respect to the coal silo project, as well as dealing with the tube failures and associated wear on equipment." F.F. 51. In response, on October 22, 2012, Landis emailed the vice president of Kobin, Daniel Nester (Nester), and another employee of Kobin, Alexander Oren (Oren), advising them, "the facility will not be taking coal through December, 2012 and they cannot provide a start-up date at this time." F.F. 52.

After receiving Landis's October 22, 2012 email, Nester informed the president and owner of Hazleton Shaft, George Roskos (Roskos), that SCI-CH would not be taking any more deliveries of coal through December due to problems with the coal Boilers. F.F. 56. On November 13, 2012, an environmental engineer manager consultant for DOC sent a letter to the environmental engineer at the Department of Environmental Protection stating that Boiler #3 had been deactivated, Boiler #2 required repairs to be operational, and SCI-CH was operating the oil-fueled boilers that would be supplemented with an additional oil-fueled boiler to supplement SCI-CH's heating capacity in lieu of using Boiler #2.[2] F.F. 57. On November 21, 2012, Gouse sent an email to Landis of DGS informing him that Boiler #3 was in the process of being deactivated, Boiler #2 was in need of repairs and DOC did not "anticipate any coal deliveries to SCI-CH until at least February." F.F. 59.

On November 26, 2012, Landis sent an email to Nester and Oren at Kobin, advising them that "SCI-CH does not anticipate taking any coal deliveries until at least February 2013" and "we are reducing the annual estimate at SCI Camp Hill by 4,100 tons to 9,500 tons." F.F. 60. Attached to the email, Landis included a

---

[2] The Board noted that this was the earliest documentary evidence that a decision had been made to add an additional oil-fueled boiler in lieu of using Boiler #2. F.F. 57.

6

revised estimate sheet showing estimated coal deliveries from July 2012 through June 2013 totaling 9,500 tons. F.F. 61. Although the text of Landis's email indicated that there would be no coal deliveries until at least February, the revised estimate sheet incorrectly included an estimated delivery of 1,800 tons in January 2013. F.F. 62. Even if DGS and DOC had capital funding in place to perform all the extensive repairs, and an appropriation of the General Assembly would not be necessary, the work could not have been completed before the end of the contract period because "it would be a better part of a year" before a contractor could be on site to be able to do something.[3] F.F. 64; 10/4/17 Notes of Testimony (N.T.) at 160.

On December 7, 2012, Gouse sent a detailed email to SCI-CH superintendent, Laurel Harry, to report that Boiler #2 must have the "stoker/traveling grates" rebuilt at a cost of $593,750 and Boiler #3 requires more extensive work at a cost of over $1,400,000. F.F. 67. Gouse further reported that SCI-CH is burning fuel oil in the two operating oil boilers and an additional rental oil boiler is in place but not yet operational pending action on several bids to install and connect it. F.F. 67.

On December 24, 2012, Landis made a request to the facilities that burn coal, including SCI-CH, to notify DGS if they planned to deviate from their annual estimates by more than 10% during the contract year. F.F. 70. At this point, total actual coal delivery to SCI-CH included only 1,447 tons through October 2012. F.F. 71. Shortly thereafter, on January 22, 2013, a state senator convened a meeting to address coal usage by DOC, including SCI-CH. F.F. 74. At the January 22, 2013 meeting, a representative of DOC told Kobin's Nester that "SCI-CH would not be

---

[3] We note that DOC eventually obtained funding from the General Assembly for the boiler repairs on November 1, 2013, though the request (via Senate Bill 680, Printer's Number 998) did not get introduced until March of 2013. *See* Kobin and Hazleton Shaft's Exhibit (Ex.) 35.

ordering any more coal deliveries for the remainder of the 2012-2013" contract period. F.F. 77. Shortly after this meeting, Nester informed Hazleton Shaft that a DOC representative had said at the meeting that SCI-CH would not be ordering any more coal for the contract period. F.F. 78. SCI-CH did not order any coal deliveries after September 2012. F.F. 82.

On August 30, 2013, Kobin and Hazleton Shaft filed a Claim for Determination with DGS seeking permission to ship a minimum of 9,500 tons of anthracite coal to an SCI location other than SCI-CH at the price agreed to by the contract. Claim for Determination ¶ 17. DGS, through its Chief Procurement Officer, denied the request by letter dated December 20, 2013, explaining, "I have reviewed the [c]laim and have found no basis for granting relief under the [c]ontract." 12/20/13 Correspondence by Chief Procurement Officer, Michael Richart.

On January 6, 2014, Kobin and Hazleton Shaft filed a Statement of Claim with the Board against DGS and DOC alleging five counts, including constructive fraud and breach of contract.[4] To support the count for constructive fraud, Kobin and Hazleton Shaft alleged that DGS and DOC represented that approximately 13,600 tons of coal would be supplied to SCI-CH per the contract. Statement of Claim ¶ 28. Kobin and Hazleton Shaft alleged that DGS and DOC made material "representations" in October and November of 2012 regarding the condition of the coal Boilers and the quantity of anthracite coal that SCI-CH required

---

[4] The three other counts included negligent misrepresentation, promissory estoppel and a claim for penalties and attorneys' fees. The Board explained that it had no jurisdiction over the tort claim of negligent misrepresentation. Counsel for Kobin and Hazleton Shaft acknowledged that the claim for promissory estoppel was based on settlement discussions, substantial evidence of which would largely be inadmissible at hearing. Board Opinion at 27, n.4. Kobin and Hazleton Shaft do not challenge the Board's decision not to address these counts.

8

pursuant to the contract. *Id*. ¶¶ 29-30. Kobin and Hazleton Shaft alleged that the representations made by DGS and DOC were "false and/or misleading" and caused Kobin and Hazleton Shaft financial harm in the amount of $890,800 "together" with interest and costs of suit. *Id*. ¶¶ 33 & 36. To support the claim for breach of contract, Kobin and Hazleton Shaft alleged that DGS and DOC issued a "revised estimate sheet" on or about November 26, 2012, which reduced the annual estimate of anthracite coal at SCI-CH to 9,500 tons. *Id*. ¶ 47. DGS and DOC did not issue any additional revised estimate sheets during the contract term for SCI-CH, nor did they issue a purchase order to ship 9,500 tons of anthracite coal prior to the expiration of the contract, thereby breaching the contract, causing Kobin and Hazleton Shaft to suffer a loss of $622,250 under the contract. *Id*. ¶ 50.

DGS and DOC filed an answer denying the allegations and new matter. In the new matter, DGS and DOC asserted that they did not have a contract with Hazleton Shaft and, therefore, Hazleton Shaft is not a proper party.[5] New Matter ¶ 1. DGS and DOC further averred that the contract, by its terms, did not require them "to commit to purchase the estimated quantities of coal identified in that contract." New Matter ¶ 9. Finally, DGS and DOC denied that they made "any representations" that misled Kobin and Hazleton Shaft "into believing that they were guaranteed that any specific amount of coal would be ordered by DGS and DOC" and requested judgment in their favor. New Matter ¶ 10.

---

[5] In the new matter, DGS and DOC stated that they did not object to having Hazleton Shaft as a party for convenience in presenting the claims but also indicated that they do not waive their objections that it is an improper party because there is no privity of contract between DGS, DOC and Hazleton Shaft. Answer and New Matter ¶ 2.

After a hearing on the matter on April 2, 2018, the Board entered judgment of no award in favor of DGS and DOC. In so ordering, the Board concluded:

> Having found insufficient factual basis for [Kobin and Hazleton Shaft's] claim on the theory of constructive fraud; no breach of the July 11, 2012 [c]ontract for a failure of either an implied duty of good faith or of the statutory duty of good faith imposed on the [c]ontract by [Section 1304 of the Pennsylvania Uniform Commercial Code, 13 Pa. C.S. § 1304]; and insufficient evidence to calculate [Kobin and Hazleton Shaft's] damages with reasonable certainty in any event, it is unnecessary to address the issue of whether or not Hazleton Shaft is an intended third-party beneficiary of the [c]ontract.

Board Opinion at 52. Kobin and Hazleton Shaft petition this Court for review.[6]

## I. Constructive Fraud

On appeal, Kobin and Hazleton Shaft argue that the Board erred when it concluded that they did not meet their burden of proving that DGS and DOC committed constructive fraud with respect to the original 13,600-ton coal usage estimate. Kobin and Hazleton Shaft's Brief at 15. To establish a claim for constructive fraud, an aggrieved contractor must satisfy the following five-part test:

> (1) Whether a positive representation of specifications or conditions relative to the work is made by the governmental agency letting the contract or its engineer.

---

[6] On review of a decision from the Board of Claims, this Court's scope of review is limited to determining whether constitutional rights have been violated, an error of law has been committed, or findings of fact are supported by substantial evidence. *Dep't of Gen. Servs. v. Pittsburgh Bldg. Co.*, 920 A.2d 973 (Pa. Cmwlth. 2007). This Court reviews the interpretation of contractual provisions as a question of law. *Id*.

(2) Whether this representation goes to a material specification in the contract.

(3) Whether the contractor, either by time or cost restraints, has no reasonable means of making an independent investigation of the conditions or representations.

(4) Whether these representations later prove to be false and/or misleading either due to actual misrepresentation on the part of the agency or its engineer or, by what amounts to a *misrepresentation through either gross mistake or arbitrary action* on the part of the agency or its engineer.

(5) Whether, as a result of this misrepresentation, the contractor suffers financial harm due to his reliance on the misrepresentation in the bidding and performance of the contract.

*Acchione and Canuso, Inc. v. Dep't of Transp.*, 461 A.2d 765, 768 (Pa. 1983) (emphasis added). The Board concluded that Kobin and Hazleton Shaft failed to meet their burden to prove element four, with regard to the original estimate of 13,600 tons,[7] and element five as explained in more detail below.

---

[7] The Board did find that element four was satisfied as to the revised estimate of 9,500 tons. Specifically, the Board concluded: "Given DOC's assessment of Boiler #2's capabilities on or about November 26, 2012, as well as the lack of communication between DOC and Mr. Landis, we conclude that Mr. Landis's revised estimate of 9,500 tons amounts to a misrepresentation through gross mistake or arbitrary action by him as a representative of DGS and agent of DOC." Board Opinion at 43. The Board explained that Landis provided this estimate when SCI-CH's Boiler #3 had been deactivated; Boiler #2 required repairs to be operational and the communications by DOC internally stated that coal use will drop by 80% to 1,800 tons; and DOC had made arrangements to add an oil-fired boiler until Boiler #2 could be operational. *Id*. at 42-43. These facts, combined with the knowledge that the repairs could not be done without following processes to fund and perform the repairs, established that DOC knew that the repairs could not be completed by the end of the contract period. *Id*. at 43.

*A. Misrepresentation Through Gross Mistake or Arbitrary Action*

The Board concluded that Kobin and Hazleton Shaft failed to meet their burden of showing that the estimate of 13,600 tons for SCI-CH initially provided in the bid documents and contract, which later proved to be inaccurate, was made as a result of an "actual misrepresentation," or by what amounts to a misrepresentation, through "gross mistake or arbitrary action." Board Opinion at 40. In so concluding, the Board reasoned:

> [t]he evidence produced clearly established that the initial usage estimate of 13,600 tons of coal for SCI-CH turned out to be false and wholly inaccurate, but failed, in our view, to establish that the estimate resulted from an actual misrepresentation (i.e. a representation known to be false at the time) or one made by reason of gross mistake or arbitrary action. To the contrary, while [Kobin and Hazleton Shaft] did show that Boiler #3 was not, and likely would not be, operational from March 2012 onward, the evidence adduced at hearing indicated that Boiler #2, the remaining coal boiler, was operational at the time the [c]ontract was bid and signed in the April to mid-July 2012 time frame. Moreover, while the status of Boiler #2 was arguably uncertain during this time period, no evidence was provided to show that the effect of these boiler issues on SCI-CH's estimated coal usage of 13,600 ton for the [c]ontract period could have been quantified at that time . . . [Kobin and Hazleton Shaft] also failed to produce any persuasive evidence that [DGS and DOC] had <u>decided</u> during the bidding, contracting or even in the early stages of the [c]ontract [p]eriod, to forego the use of coal as a heat source for SCI-CH.

Board Opinion at 40-41.

Kobin and Hazleton Shaft contend that the Board erred because the facts, as found by the Board, show that DOC knew prior to the contract period that

Boilers #2 and #3 were not likely operational and that there were problems with the Boilers that would impact the coal usage. Kobin and Hazleton Shaft's Brief at 17. Kobin and Hazleton Shaft assert that DOC had notice that the two Boilers were not likely to be operational during the contract period (commencing July 1, 2012). *Id*. In support, Kobin and Hazleton Shaft rely on the following facts: March 28, 2012 was the last date that Boiler #3 had been in operation; on June 11, 2012, DOC received an estimate for repairs for Boiler #2; on June 20, 2012, DOC received two quotes with respect to Boiler #3 to refurbish it; and DOC knew that it could take two years to obtain funding for the project due to budget challenges. *Id*. at 17-18. As of July 2012, DOC had not commenced the process to obtain the necessary funding. *Id*.

DGS and DOC counter that the Board did not err because, while the Board noted that the initial estimate of anticipated coal usage by SCI-CH later proved inaccurate, the evidence failed to establish that the estimated quantity resulted from a misrepresentation, gross mistake or arbitrary action. DGS and DOC's Brief at 7. The evidence established that Boiler #2 was operational at the time of contract bidding and execution and, notwithstanding the problems with the coal-burning Boilers, DOC always intended to continue and/or resume burning coal at the facility during the contract term. *Id*. Finally, DGS and DOC noted that the contract allowed the Commonwealth to increase or decrease the quantities of coal as needed. *Id.*

Upon review, we do not find error with the Board's conclusion that Kobin and Hazleton Shaft failed to meet their burden to show that the original 13,600-ton coal estimate was an "actual misrepresentation" or "misrepresentation through either gross mistake or arbitrary action." Board Opinion at 40. As explained

13

by the Board, though Boiler #3 was not operational at the time of contracting, DOC ordered coal for the months of July, August and September 2012 in amounts close to the estimated amounts. Board Opinion at 32; F.F. 24; Kobin and Hazleton Shaft's Exhibit (Ex.) 5. DOC received estimates for repairs on the Boilers that summer and continued to use Boiler #2 during that time until the fall when Boiler #2 ceased to operate and both Boilers required extensive repairs "to the stokers and tubes" and associated wear on the equipment. Kobin and Hazleton Shaft's Ex. 8. DOC did not have definitive information that Boiler #2 was not operational and required extensive repairs, such that it had to switch to using the oil-fueled boiler, to supplement the heating capacity until Fall 2012. Kobin and Hazleton Shaft's Ex. 29 (The Bureau of Operations Environmental Engineer explained that two oil-fueled boilers are operating within the permit guidelines and DOC will use "an additional [oil-fueled] [b]oiler through the winter season, until the Coal Boiler #2 can be repaired and made operational."). Thus, we find that the Board's determination that the original 13,600-ton coal estimate was not an "actual misrepresentation" or "misrepresentation through either gross mistake or arbitrary action on the part of the agency or its engineer" is supported by substantial evidence.

### B. Suffered Financial Harm due to Reliance on Misrepresentation

With respect to damages, the Board concluded that Kobin and Hazleton Shaft failed to establish the fifth element of its constructive fraud claim, *i.e.*, they failed to establish that they actually suffered financial hardship *due to their reliance on the misrepresentation* in Landis's November 26, 2012 email or on any of the alleged misrepresentations. Board Opinion at 44. The Board found that although Kobin and Hazleton Shaft submitted calculations to represent alleged financial harm,

14

those calculations were based on lost profits (the difference between gross sales per the contract and subsequent sales) rather than "reliance damages" as required to establish a claim for constructive fraud. *Id*. at 45.

Kobin and Hazleton Shaft contend that the Board erred because their "lost profits" support a conclusion of financial harm. Kobin and Hazleton Shaft's Brief at 21. Kobin and Hazleton Shaft argue that by "having reasonably relied upon the [r]evised [e]stimate of 9,500 tons," they also "suffered additional financial losses as a result of producing and stockpiling [B]arley coal for SCI Camp Hill, which it wouldn't have otherwise done." *Id*. DGS and DOC respond that Kobin and Hazleton Shaft have "failed to establish their actual reliance and/or entitlement to rely upon the alleged misrepresentations by DGS and DOC." DGS and DOC's Brief at 12. DGS and DOC further claim that the contract language regarding estimated quantities makes "clear" that Kobin and Hazleton Shaft were not entitled to rely upon any estimated quantities. *Id*.

To obtain damages, the contractor, Kobin, must prove that as a result of the misrepresentation by DGS, Kobin suffered financial harm "*due to [its] reliance on the misrepresentation*" in the performance of the contract (emphasis added). *Acchione and Canuso, Inc.*, 461 A.2d at 768. In considering this issue, our court has considered the unanticipated "increased expenses" incurred by a contractor to complete the project, which it had contracted to perform, as the financial harm brought on by the agency's misrepresentation. *See Dep't of Gen. Servs. v. Pittsburgh Bldg. Co.*, 920 A.2d 973, 985 (Pa. Cmwlth. 2007) (reliance on the agency's statements regarding the suitability of soil conditions caused the contractor to incur *increased expenses* to complete the project, *i.e.*, the financial harm, because the contractor had to address unanticipated rocky conditions to complete the project);

15

*Acchione and Canuso, Inc.* 461 A.2d at 769 (holding that contractor entitled to recover for damages where *increased expenses* incurred by contractor were a "direct result" of the reliance on the misrepresented bid specification).

At the Board hearing, Kobin produced no evidence showing that it acted in reliance on Landis's email, *i.e.*, that it had ordered coal from Hazleton Shaft following his November 26, 2012 email or that Hazleton Shaft stockpiled the coal to meet Landis's November 26, 2012 revised estimate of 9,500 tons. R.R. 241-42. Kobin did not order coal during that period because it received no purchase orders from DOC after September. F.F. 82.

Further, Roskos, president and owner of Hazleton Shaft, testified as to damages[8] at the hearing for both Kobin and Hazleton Shaft.[9] Roskos testified that as soon as he made the commitment to Kobin under the contract, he started putting tonnage on the ground to ensure that Hazleton Shaft had the amount of tons necessary to meet the contract terms based on the schedule. R.R. 241 & 247. Roskos could not say exactly how much coal he had in stockpile because he had produced coal for the contract, as well as to have available for other opportunities. R.R. 241-42 & 245. Roskos testified that he produced the coal at $105 per ton and, in 2014, sold 40 tons for $150 per ton and 9,460 tons for $115 per ton, both in excess of production costs. R.R. 228-29. Though Hazleton Shaft sold the coal at a price less than DGS and DOC agreed to pay under the contract (at $183 per ton), Hazleton

---

[8] The testimony on the damages consisted of "combined" amounts for both Kobin and Hazleton Shaft. R.R. 230. Roskos testified that it is a combination of damages because there is a portion that Kobin "had for their [sic] profit in this as well" and that "my $155 a ton that I was selling to Kobin, at, [sic] the rest is his, between $155 and $170." R.R. 230.

[9] We agree that the Board did not address the question of Hazleton Shaft's standing; however, there is no need to remand on this issue because, as explained herein, the substantive claims cannot stand.

16

Shaft still realized a profit, albeit, not as great a profit as it expected to receive under the contract. Roskos testified that the loss was "opportunity cost." R.R. 248. Kobin and Hazleton Shaft did not realize as much of a financial gain as they hoped or anticipated under the contract, but they produced no evidence to show that they incurred a "financial harm" in relying upon the alleged misrepresentation to support a claim for constructive fraud.[10]

## II. Breach of Duties of Good Faith and the Doctrine of Necessary Implication

Kobin and Hazleton Shaft next contend that the Board erred by failing to find that DGS and DOC had breached their duties of "good faith" in the performance of the contract. Kobin and Hazleton Shaft's Brief at 22. Kobin and

---

[10] The Board further stated with regard to [Kobin and Hazleton Shaft's] claimed damages:

> we encounter problems in trying to quantify [Kobin and Hazleton Shaft's] damages on the evidence presented. For one thing, the mistaken representation on November 26, 2012 that SCI-CH still expected to use 9,500 ton for the [c]ontract period was corrected at the January 22, 2013 meeting, and we simply do not see adequate evidence from which to ascertain what damages [Kobin and Hazleton Shaft] suffered during the time period this misrepresentation was in effect. Furthermore, based on the evidence provided, it would appear that [Kobin and Hazleton Shaft] had an opportunity to mitigate their claimed damages by attempting to sell any Barley coal that was stockpiled beginning in January 2013 rather than waiting until April, May or June of 2013 when the market, in their words, 'collapsed' but failed to act on this opportunity. Because [Kobin and Hazleton Shaft] did not act to mitigate damages by attempting to sell any such stockpiled coal promptly after the January 22, 2013 meeting, we find this to be an additional unknown in any attempt to arrive at a damages amount owing to [Kobin and Hazleton Shaft] without engaging in speculation or conjecture.

Board Opinion at 51-52.

17

Hazleton Shaft assert that there is an "implied" duty of good faith and fair dealing that DGS and DOC had to abide by, Section 205 of the Restatement (Second) of Contracts (Am. Law Inst. 1981), and further assert that the Board erred in failing to find a violation of Section 2306(a) of the Pennsylvania Uniform Commercial Code (UCC), 13 Pa. C.S. § 2306(a). Kobin and Hazleton Shaft's Brief at 23 & 26. Finally, Kobin and Hazleton Shaft claim that the doctrine of necessary implication gives rise to implied terms of the contract concerning requirements for the purchase of coal and communication between the parties. *Id*. at 33 & 35.

DGS and DOC counter that Kobin and Hazleton Shaft have failed to identify a duty that they breached under the contract and, instead, rely upon "the implied duty of good faith and fair dealing and the doctrine of necessary implication in an effort to impose nonexistent duties" upon DGS and DOC that are "contrary" to the nature and terms of the requirements contract mutually entered into between the parties. DGS and DOC's Brief at 16. To that end, DGS and DOC assert that the implied duty of good faith and the doctrine of necessary implication are not applicable here and that they acted in good faith pursuant to the Pennsylvania UCC. *Id*. at 17-18.

In claiming that DGS and DOC breached the duty of good faith and fair dealing, Kobin and Hazleton Shaft specifically assert that, under a requirements contract, the reasonable expectation would be that the actual requirements would closely approximate the estimated tonnages for which Kobin bid. Kobin and Hazleton Shaft's Brief at 23. Once DGS and DOC became aware of the problem, they could have given notice of a force majeure event[11] or fully informed Kobin of

---

[11] Upon review of the contract, the provision relating to a "force majeure" event does not address equipment failure; rather, it speaks to acts of God, civil disorders, and other like events.

18

the degree of the problems earlier to enable Hazleton Shaft to stop stockpiling the coal and protect itself from damages. *Id*. at 24 & 31. Kobin and Hazleton Shaft assert that DGS and DOC should have: notified them every step of the way from the pre-bid teleconference that Boiler #3 was not in operation; provided the receipt of estimates by DOC to get the repairs done to Boilers #2 and #3; and, of course, included them in the communications between DGS and DOC in the fall of 2012. Kobin and Hazleton's Brief at 28-31.

### A. Implied Duty of Good Faith: Section 205 of the Restatement (Second) of Contracts

Section 205 of the Restatement (Second) of Contracts provides that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (Am. Law. Inst. 1981); *Agrecycle, Inc. v. City of Pittsburgh*, 783 A.2d 863, 867 (Pa. Cmwlth. 2001). The Board concluded that the implied duty of good faith cannot be employed here, relying on this Court's decision in *Agrecycle, Inc.*, because Kobin

---

Even if it was applicable to equipment failure, the provision places a duty on the contractor, not the Commonwealth, to give notice of the event. R.R. 61. The Force Majeure provision provides:

> Neither party will incur any liability to the other if its performance of any obligation under this Contract is prevented or delayed by causes beyond its control and without the fault or negligence of either party. *Causes beyond a party's control may include, but aren't limited to,* acts of God or war, changes in controlling law, regulations, orders or the requirements of any governmental entity, severe weather conditions, civil disorders, natural disasters, fire, epidemics and quarantines, general strikes throughout the trade, and freight embargoes.

V.31 CONTRACT-022.1 Force Majeure (Oct. 2006), R.R. 61 (emphasis added). The provision further provides the notice requirements for the contractor to abide by and allows the Commonwealth to cancel the contract. *Id*.

and Hazleton Shaft sought to use the implied duty of good faith to change the contract terms. Board Opinion at 48. The Board explained that Kobin and Hazleton Shaft were attempting to transform the contract into one where DGS and DOC were required to take their estimated coal requirements instead of, as the contract provided, their actual coal requirements. *Id.* Upon review, we agree.

> The courts have defined the duty of "good faith" as "[h]onesty in fact in the conduct or transaction concerned," adopting the definition set forth in Section 1201 of the [UCC], *as amended*, 13 Pa. C.S. § 1201 . . . The good faith obligation may be implied to allow enforcement of the contract terms in a manner that is consistent with the parties' reasonable expectations . . . In Pennsylvania, the courts have recognized the duty of good faith only in limited situations . . . the duty of good faith may not be implied where (1) a plaintiff has an independent cause of action to vindicate the same rights with respect to which the plaintiff invokes the duty of good faith; (2) such implied duty would result in defeating a party's express contractual rights specifically conveyed in the written contract by imposing obligations that the party contracted to avoid; or (3) there is no confidential or fiduciary relationship between the parties.

*Agrecyle, Inc.*, 783 A.2d at 867-69 (holding that to impose a duty on the city to deliver material "estimated" in bid specifications when agreement provided that the city would not "warrant or guarantee the quantity" or quality of the compostable materials to be delivered by the city would disregard the unambiguous language in agreement defeating the intention of the parties); *see Cable & Assocs. Ins. Agency, Inc. v. Commercial Nat'l Bank of Pa.*, 875 A.2d 361, 364 (Pa. Super. 2005) (holding that appellee's decision to exercise its contractual rights against appellants to retain

20

a security interest in appellants' property cannot, as a matter of law, constitute a breach of contractual good faith).

Here, Kobin and Hazleton Shaft's complaint is that DGS and DOC caused them harm by not issuing a "purchase order directing [Kobin] and [Hazleton Shaft] to ship 9,500 tons of anthracite coal to SCI Camp Hill prior to the expiration of the [c]ontract which was a breach of the [c]ontract." Statement of Claim ¶ 49, R.R. 8. As explained by the Board, the contract by its terms required DGS and DOC to purchase the coal as needed, not as estimated. R.R. 54. This Court cannot imply a duty on DGS and DOC to purchase estimated amounts of coal when the contract, by its terms, provided that DGS and DOC contract and agree to purchase "only the materials . . . in such quantities as represent the *actual requirements* of the Commonwealth." R.R. 54 (emphasis added); *Agrecycle, Inc.*, 783 A.2d at 868.

### B. Good Faith in Commercial Contracts: Section 2306 of the UCC

The parties, here, however, agree that Section 2306(a) of the Pennsylvania UCC governs the contract at issue and provides:

> (a) **Quantity measured by output or requirements**. —A term which measures the quantity by . . . the requirements of the *buyer means such actual output or requirements as may occur in good faith*, except that no quantity unreasonably disproportionate to any stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

13 Pa. C.S. § 2306(a) (emphasis added).[12] Though this provision requires the parties to perform their duties and to enforce commercial contracts in "good faith," our

___

[12] According to the accompanying UCC Comment, "[i]f an estimate of … requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or

Supreme Court recently held that the breach of duty does not "create a separate cause of action." *Hanaway v. Parkesburg Grp., L.P.*, 168 A.3d 146, 157 (Pa. 2017). Rather, the failure to perform a specific duty or obligation under the contract constitutes a "breach of that contract." *Id.* The "doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached." *Id.*

As applied here, the Board explained that Section 2306(a) of the Pennsylvania UCC controls and imposes good faith "in determination of the buyer's actual requirements, not in making gratuitous estimates." Board Opinion at 49. To this end, the Board explained that it did not:

> see the evidence as supporting a claim for lack of good faith on the part of DGS or DOC as a matter of fact. Although we believe Mr. Landis's estimate of 9,500 ton was made arbitrarily (without factual support) it is clear to us that he was motivated by a good faith desire to keep Kobin apprised of the circumstances at SCI-CH as best he could. Moreover, while DOC coal requirements estimates were incorrect, [Kobin and Hazleton Shaft] have not provided the Board with sufficient evidence to establish their coal usage estimates were made in bad faith.

*Id.* at 50 (footnote omitted). The Board's finding that Landis was motivated by a "good faith" desire to keep Kobin apprised of the circumstances and actual coal needs of the facility is supported by the record.

Once Landis obtained information from DOC regarding the facility's actual requirements, on both occasions, he promptly reached out to Kobin with

---

demanded," but "[a]ny minimum or maximum set by the agreement shows a clear limit on the intended elasticity" with the "essential test" being "whether the party is acting in good faith." 13 Pa. C.S. § 2306(a), UCC cmts. 2 & 3.

updates on SCI-CH's actual coal needs. On October 5, 2012, Landis received information from the Chief Engineer for DOC, Klinikowski, that SCI-CH "cannot burn coal since there is damage to [its B]oilers." Kobin and Hazleton Shaft's Ex. 8. On the same day, Landis replied to Klinikowski:

> The coal bid estimate for Camp Hill is 13,600 tons and the supplier has put up money to hold this tonnage. If we are not burning coal or a reduced amount then I need to inform the supplier. So what should I tell the supplier? Based on your e-mail it appears we will not be taking any coal at least through December, 2012. Per the facility estimates this amount is 5,700 tons. *The supplier has dollars at risk if we take no coal so we need to provide them [sic] a reduced estimated [sic].* So should I tell Kobin Coal the awarded supplier we are not taking any coal f[or] Camp Hill through December and will provide them [sic] an update on the remaining usage before the end of the year? What are your thoughts?

*Id*. (emphasis added). On October 22, 2012, Landis followed up with Klinikowski and Gouse, and others, asking if "we have an update on the coal situation at Camp Hill?" *Id*. Gouse responded, asking Landis to notify Kobin that "we won't be taking any coal through December at a minimum." *Id*. Landis replied, "Thanks I will inform Kobin . . . you will not be taking coal through December, 2012. If your situation changes please let us know." *Id*. On the same day, Landis notified Kobin of the status. *Id*.

As a follow up to Landis's request, on November 21, 2012, Gouse emailed Landis with an update: DOC did not anticipate any coal deliveries to SCI-CH "until at least February." Kobin and Hazleton Shaft's Ex. 12. Five days later, Landis emailed Kobin advising it of the same, but mistakenly attached a revised estimate sheet that contained the mathematical error changing the annual estimate to

23

9,500 tons.  Kobin and Hazleton Shaft's Ex. 13.  Though the revised estimate sheet contained a mistake, these communications support the Board's determination that Landis attempted to keep Kobin informed of the facility's actual needs as required by the contract.  Therefore, the Board's conclusion that Kobin and Hazleton Shaft did not produce evidence to show that DGS and DOC breached the duty imposed by Section 2306(a) of the Pennsylvania UCC is supported by the record.

### C. Doctrine of Necessary Implication

Kobin and Hazleton Shaft next assert that the Board erred when it did not consider or apply the doctrine of necessary implication to this case.  Kobin and Hazleton Shaft's Brief at 33-34.  DSG and DOC counter that the Board was correct to ignore this argument because the doctrine rarely applies.  DGS and DOC's Brief at 22-23.  The doctrine provides:

> [i]n the *absence of an express provision*, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose of the contract and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. . . . The doctrine of necessary implication may be applied only in limited circumstances to prevent injustice *where it is abundantly clear that the parties intended to be bound by the terms sought to be implied.*

*Agrecycle, Inc.*, 783 A.2d at 868 (emphasis added) (refusing to apply the doctrine because it would defeat the express bargained for terms of the contract).

Kobin and Hazleton Shaft claim that a term must be implied into the contract to require DGS and DOC to purchase a minimum amount of coal.  Kobin and Hazleton Shaft's Brief at 34.  Kobin and Hazleton Shaft further assert that a term

24

must be implied to require that DGS "periodically update [Kobin] regarding the tonnage estimates at SCI Camp Hill as well as inform [Kobin] of any and all relevant factors which might materially affect tonnage estimates." *Id*. at 36. What Kobin and Hazleton Shaft are seeking, however, is to imply provisions into the contract that are not actually there to support their position. The doctrine of necessity only applies in cases where it is clear that such a missing provision was the intention of *both* parties.

For example, in *Slater v. Pearle Vision Center, Inc*. 546 A.2d 676, 679-80 (Pa. Super. 1988), the Superior Court addressed this issue. In *Slater*, the Superior Court had before it a commercial lease dispute in which the tenant, Pearle, never occupied the premises that it leased from the shopping center. *Id*. at 677. The shopping center had concerns that the presence of a vacant store could damage the business of the mall and filed a complaint in equity seeking an injunction to require Pearle to occupy the premises. *Id*. Applying the doctrine of necessary implication, the Court stated that though the lease did not expressly provide a provision requiring the tenant to occupy the premises, several paragraphs in the lease had language from which the Court could imply that requirement. *Id*. at 679-80. The Court cited a subparagraph in the lease that provided that the tenant agrees to "open the Premises for business to the public not later than . . . 90 days after Landlord's approval of Tenant's plans and specifications." *Id*. at 680. The Court reviewed other similar provisions of the lease, including a provision that limited the amount of time that the premises could be vacant, to conclude that the shopping center pleaded a minimal claim based on an "implied obligation to occupy and use." *Id*. at 681.

But, in cases where the contract does not have language to suggest the parties' intentions, our courts have declined to apply the doctrine to reach a result

25

contrary to the express terms of the contract. *See Agrecycle, Inc.*, 783 A.2d at 868-69 (rejecting application of the doctrine, explaining that applying it would "defeat the express, bargained-for terms of the agreement, in which the City did not guarantee or warrant the quantity and quality of the compostable materials to be delivered to Agrecycle"); *Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 720 (Pa. Super. 1996) (rejecting application of the doctrine because "[w]e may not imply the contractual duty to provide continuous uninterrupted service or unrequested credits for outages when it is unclear whether the cable companies clearly intended to be bound by this obligation" as the obligation is not expressly stated nor is there any provision to suggest that the cable companies obligated themselves).

Here, Kobin and Hazleton Shaft overlook the express provisions of the contract that required DGS and DOC to purchase only their actual coal requirements, namely, that it:

> *shall* be understood and *agreed* that *any quantities* listed in the [c]ontract *are estimated only* and may be increased or decreased in accordance with the *actual requirements* of the Commonwealth and that the *Commonwealth in accepting any bid or portion thereof, contracts only and agrees to purchase only the materials and services in such quantities as represent the actual requirements of the Commonwealth.*

R.R. 54 (emphasis added). As such, there is not an absence of a provision that would give rise to the applicability of the doctrine of necessary implication. *See Slater*, 546 A.2d at 680. Rather, the express provisions making the contract a requirements contract are present in the contract and no additional provision need be implied. While the Board did note in its analysis that the implied duty of good faith cannot be used to change a contract term, the Board did not specifically address Kobin and Hazleton Shaft's claim that the doctrine of necessary implication was applicable.

26

However, this Court finds that the Board's omission was not error because the doctrine, as noted above, is inapplicable to the case *sub judice*.

### III. Notice and Duty to Mitigate Damages

Finally, Kobin and Hazleton Shaft contend that the Board erred by considering the verbal statements made on January 22, 2013 to a Kobin representative to be effective "notice" under the contract that no more coal would be shipped and by determining that the statements triggered an obligation for Hazleton Shaft to mitigate its damages. Kobin and Hazleton Shaft's Brief at 37. In support, Kobin and Hazleton Shaft rely on Paragraph 43 of the contract, asserting that it required the notice to be in writing and signed by all the parties to be valid and binding. *Id*. Paragraph 43 provides, in part:

> This [c]ontract, including the [i]nvitation for [b]ids, the [c]ontractor's bid, all referenced documents, and any [p]urchase [o]rder constitutes the entire agreement between the parties. No agent, representative, employee or officer of either the Commonwealth or the contractor has the authority to make, or has made, any statement, agreement or representation, oral or written, in connection with the [c]ontract, which in any way can be deemed to modify, add to or detract from, or otherwise change or alter its terms and conditions.

V.43 CONTRACT-034.1b Integration (Nov. 30, 2006); R.R. 72. Though Kobin and Hazleton Shaft assert that this provision requires "notice," the plain language of the provision does not use the term notice. Rather, the language explains what documents are considered part of the contract and that no agent, representative,

27

employee or officer of the Commonwealth may modify or alter the terms of the agreement.

Here, the record shows that the January 22, 2013 meeting had been scheduled because Kobin, through Nester, wanted to find out why "we weren't shipping coal to Camp Hill." 10/3/17, N.T. 67. At the January 22, 2013 meeting, a representative of DOC indicated to Nester that DOC did not anticipate ordering any more coal during the contract year. R.R. 256-57. Shortly after the meeting, Nester informed Roskos of Hazleton Shaft that a DOC representative told him that SCI-CH would not be ordering any more coal for the contract period. R.R. 256-57.

Through this statement, the Commonwealth was not modifying or changing the terms of the contract. As stated previously, Kobin and Hazleton Shaft were retained to provide coal for the Commonwealth's actual needs. R.R. 54. The statements informed Hazleton Shaft that SCI-CH did not anticipate ordering additional coal during the contract period. The Board did not err by considering those statements as "notice" to Kobin and Hazleton Shaft that the Commonwealth did not intend to order additional coal. Because Kobin and Hazleton Shaft knew by January 22, 2013 that DOC was not going to order additional coal for the contract period, the Board properly concluded that Kobin and Hazleton Shaft should have immediately taken steps to sell the coal that they had been holding for this contract to mitigate their damages.

"As a general proposition of contract law, a party who suffers a loss due to a breach of contract has a duty to make a reasonable effort to mitigate his losses." *Bafile v. Borough of Muncy*, 588 A.2d 462, 464 (Pa. 1991). Once a party "has reason to know that performance by the other party will not be forthcoming," a party is expected to take such affirmative steps as are appropriate in the circumstances to

28

avoid loss by making substitute arrangements or otherwise. Restatement (Second) of Contracts § 350 (Am. Law. Inst. 1981), *cmt*. b. The duty to mitigate damages is not onerous and does not require success but simply to make an "honest good-faith effort." *Vladimirsky v. Sch. Dist. of Phila.*, 144 A.3d 986, 1004 (Pa. Cmwlth. 2016).

The evidence indicates that Hazleton Shaft did not sell the Barley tonnage that had been set aside for shipments to SCI-CH until the beginning of 2014, approximately a year after DOC provided notice. R.R. 230. Hazleton Shaft, through Roskos, explained that the "bottom dropped out of the coal market" in the spring of 2013 (the April, May, June period). R.R. 230-31. Roskos further explained, "[t]here was another supplier that supplied coal to the state. I believe it was $90-some a ton. And we just couldn't compete at that. That was actually below my cost of production." R.R. at 230.

We agree with the Board that upon receiving notice in January 2013, neither Kobin nor Hazleton Shaft made an "honest good-faith effort" to avoid loss, *i.e.*, by trying to immediately sell the coal that Hazleton Shaft allegedly held for SCI-CH. Even if Kobin and Hazleton Shaft presented evidence to support a breach of the contract, their claims against DGS and DOC cannot stand as they failed to produce any evidence showing that they made timely efforts to mitigate their damages from January 2013 to the Spring of that year when the "bottom dropped out of the coal market." Therefore, the Board properly found that neither Kobin nor Hazleton Shaft made timely efforts to mitigate their damages from the end of January 2013 until the spring when the market "collapsed." F.F. 113.

## IV. Conclusion

The Board did not err by concluding that Kobin and Hazleton Shaft failed to show that DGS and DOC made a material misrepresentation relating to the

original 13,600-ton coal estimate to support their claim for constructive fraud. Though the estimate of coal usage turned out to be incorrect, Kobin and Hazleton Shaft did not produce any evidence showing that DGS and DOC's estimate was an actual misrepresentation or a misrepresentation through gross mistake or arbitrary action.

The evidence produced by DGS and DOC, and accepted by the Board, demonstrated that DOC attempted to keep the coal burning Boilers operating as long as possible through the contract period. When DOC ascertained that the Boilers could no longer be used, in the Fall of 2012, this information was communicated to DGS which timely notified Kobin. While the Board found that DGS, through the November 2012 email, provided a revised estimate of coal usage of 9,500 tons which amounted to a misrepresentation, the Board did not err when it concluded that Kobin and Hazleton Shaft failed to produce evidence showing that they suffered financial hardship due to their reliance on this, or any, alleged misrepresentation.

The Board also did not err when it concluded that Kobin and Hazleton Shaft did not meet their burden of showing that DGS and DOC breached their duties of good faith under Section 205 of the Restatement (Second) of Contracts or under Section 2306 of the UCC. The contract here required DGS and DOC to purchase the coal actually needed; nothing more. Kobin and Hazleton Shaft produced no evidence showing that DGS and DOC's coal usage estimates were made in bad faith or that they did not perform under the terms of the contract. Though Kobin and Hazleton Shaft assert before this Court that the Board erred by failing to apply the doctrine of necessary implication to require DOC to purchase 9,500 tons of coal provided in the revised estimate, the Board did not err by declining to address this argument. To provide Kobin and Hazleton Shaft with their requested relief would

30

require the Board, and this Court, to ignore the express terms of the contract agreed to by the parties, which neither the Board nor we may do.

Finally, the Board did not err when it concluded that Kobin and Hazleton Shaft failed to mitigate their damages once DOC notified them in January 2013 that DOC would not be ordering any additional coal for the contract period. Hazleton Shaft did not produce any evidence showing that it made an "honest good-faith effort" to sell the coal that it had stockpiled until a year later and, therefore, their claim for breach of contract cannot stand.

Accordingly, we affirm.

_____
CHRISTINE FIZZANO CANNON, Judge

31

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Kobin Coal Corporation and     :
Hazleton Shaft Corporation,     :
               Petitioners     :
    :
           v.     :
    :
Department of General Services     :
and Department of Corrections,     :    No. 600 C.D. 2018
            Respondents     :

## O R D E R

AND NOW, this 7th day of January, 2019, the April 2, 2018 order of the Board of Claims is hereby AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge